Gholson, J.
There are‘several classes of cases of which a district court has jurisdiction, among which are those removed from another district. The law requires that such removal shall be to “the district court of the nearest county of an adjacent district.” Whether the nearness of a county is to bo determined with reference to tho boundaries of the counties, or to the places of holding the courts, or to the convenience of travel, the law does not prescribe, and it is not necessary to decide in this case. In the absence of any clear and definite rule proscribed by tho statute, wo do not think an error in this respect, which was not made a matter of exception until after the trial of tho case, ought to bo allowed to defeat tho jurisdiction of the court. The case being one of a class of which the court properly had jurisdiction, whether it belonged to that class or not, should have been made the subject of inquiry *491 before proceeding to a trial upon tbe merits. The objection not having been taken at the proper time, must, according to the well-established rule in such cases, be regarded as waived.
The other errors which have been alleged in this case arise itpon charges of the court to the jury. The first of these charges is to( the effect that an act of the legislature, imposing a tax upon the property of the defendant in error, was unconstitutional. The ground upon which this charge was founded is shown by the argument on both sides to be that the property of the defendant in error, by the 60th section of the act to incorporate the State-*Bank of Ohio, was exempt from taxation; otherwise than as provided in that section. The correctness of the charge depends-upon the question whether the passage of that act and the incorporation of the defendant in error under it creates a contract as to the mode and extent of taxation, which is protected by the provision of the constitution of the United States, that no state shall pass-any law impairing the obligation of a contract?
There are two very recent decisions directly affecting this question —one by the Supreme Court of the United States, that such a contract was created by the section referred to, and one by this court that there was no such contract. Dodge v. Woolsey, 18 How. 331; Sandusky Bank v. Wilbor, 7 Ohio St. 481. ¥e are now called on to-determine whether we shall overrule our decision, and apply, as the-rule to govern this case, the decision of the Supreme Court of the-United Sta/tes. This leads to an inquiry as to the position in which this court stands to the Supremo Court of the United States, in reference to the conclusiveness, as precedents, of the decisions of' that court.
There is no constitutional nor legislative provision which makes-the decision of the Supreme Court of the United States, in one case, binding, as a precedent for the decision of a similar case. Such a result is claimed to follow from a tacit adoption of a rule, supposed to prevail under the English system of judicature. Story on the-Constitution, secs. 377, 378. Under that system, and the same may perhaps be said of every system in civilized countries, a rule-adopted for the decision of one case has ever been regarded as evidence of the law. The source of the evidence gives to it a certain degree of weight, which may be very much increased by extraneous circumstances, as where the decision has been frequently followed, and has become a rule of property. So the weight of a de *492 -cisión, as evidence of the law, may be influenced by the relation -of the tribunal acting upon the evidence, to the tribunal from which it proceeded.
*But it will be found that a distinction as to their weight as evidence of law between the decisions of the court of last resort .and the superior courts of law and equity in England — the obligation of the latter to follow the decisions of the former as rules of .law, without any inquiry into their correctness — has been clearly ¡admitted only in modern times. No such distinction is noticed in the remarks of Blackstone upon the decisions of the English courts .as evidence of the law of England. All are placed upon equally .high ground, and the principle upón which any decision is to be regarded as establishing a rule of law, would equally apply to all. ■“Generally speaking,” says a more modern writer upon the subject, “ a judgment given by the House of Lords is of greater au-thority than is a judgment given by a court of Westminster Hall.” He then proceeds to show that several eminent English judges .spoke of a direct authority, in tbo shape of a decision of the House of Lords, as not obligatory, and one of them said he had ruled and would rule to, the contrary. Ram on Legal Judgments, 161, 162. But vs-dien Lord Eldon, in the early part of this century, was asked to act upon their views, as to the same decision, he declined to do so. “Can I,” he said, “sitting hero, contradict a decision of the House of Lords? The question with me, adopting all the sentiments of the great persons named, as far as they go, with due submission to that court, which has a right to bind me and them, is, whether I can sot up my judgment against a judgment of the House of Lords? A rule of law, laid down by the House of Lords, -can not be reversed by the chancellor; though if there is any difference, from a circumstance that was not before the House of Lords, the cause may be decided upon that. The rule of law must remain till altered by the House of Lords.” Perry v. Whitehead, 6 Ves. 344-547. So it has been said: “ The master of the rolls might be right in his view of the law, but he conceded his opinion to that of the chancellor, knowing that ^although a master of the
rolls may be a better lawyer than a lord chancellor, the decorum -of a court of justice requires this deference from a subordinate judge.” Watson v. Sadlier, 1 Molloy, 585. And in such a case the judgment of the subordinate judge has been called “ a fettered judgment.” Baker v. Baker, 6 H. L. Cas. 616-624, Chelmsford, C.
*493 It thus appears that while the rule is now clearly established in England, and it equally prevails in this country, that the principle upon' which it rests, is one of decorum and respect, the superior tribunal’ should be left to alter its own decision — to correct its own errors, and no injustice is done to the party, for the very constitution of the tribunal admits of this being done.
If this court and the Supreme Court of the United States occupy a position analogous to that of the court of chancery, or the superior courts of law of England, and the House of Lords, then it might be very justly claimed that the same rule would apply to their-decisions.
It has been supposed that the 25th section of the judiciary act of’ the United States does, as to certain classes of cases, of which the-present would be one, make the highest court of the state subordinate to the Supreme Court of the United States, and establishes a like relation in reference to such cases, as exists between inferior and appellate courts. If so, as admitted by very respectable authority, and analogous conclusiveness of its decisions, as precedents, in the particular classes of cases, would result. Warfield v. Goodhue, 1 Comst. 62-71.
This court has, heretofore, acquiesced in the exercise of the revising power conferred upon the Supreme Court of the United. States, by the 25th section of the judiciary act. Piqua Bank v. Knoup, 6 Ohio St. 342. The constitutionality of that section has been denied in some of the states — on several occasions of peculiar-interest and importance, by the courts and other authorities of the State of Georgia, which are stated in an elaborate opinion recently-delivered in the Supreme Court of that state *(Padelford v. City of Savannah, 14 Ga.); and in a case in the court of appeals-of Yirginia, in which very able opinions were delivered by the-judges of that court, all concurring in a refusal to enter the mandate of reversal emanating from the Supreme Court of the United States. Hunter v, Martin, 4 Munf. 1.
Upon the discussion of that question we are not disposed to-enter. The ground of objection is not a want of power on the part of Congress to invest the courts of the United States with jurisdiction in the classes of eases embraced in the section, but the mode in which the power is exercised. If that mode should, from resistance, fail, one much more objectionable and inconvenient to the citizens of the state might possibly be adopted. As a practical ques *494 •tion, as a question of policy, acquiescence is probably tbe wiser and better course. But the limited and qualified character of the appellate jurisdiction, conferred by the 25th section of the judiciary .act, does not countenance the idea, which has been so plausibly advanced, that Congress had in view a uniformity of decisions upon questions arising under the constitution and laws of the United States, and that the Supreme Court was the common arbiter for the •decision of such questions To place the arbiter in a proper position, care should have been taken that either party to a case in which a question arose, might call for its interposition. The object in view appears to have been the enforcement of the constitution and laws, rather than a uniformity of decisions. The provisions of the section look entirely to the extension, and not to the restriction, of the operation of the constitution and laws of the United States. 'The steps which are permitted all point in one direction. The juris- • diction of the Supreme Court can only be invoked when the decision of a case is in one way — that is, when it is against the validity ■of a provision of the constitution or laws, and not when it is in favor of the validity. If operation and effect be given to the provision, as applied to the particular case, however ^improper .such application, however erroneous and unjust the construction given to the provision, yet, as its validity is not denied, but admitted, the Supreme Court has no power to interfere. This limited and •one-sided right of appeal certainly goes far to destroy any analogy which might be supposed to exist, to the case of subordinate and superior tribunals. Comity, decorum, and respect are to be regarded, but justice and right are entitled to a higher consideration. The judgment of an inferior court is fettered by a decision of the court above, but the party affected by the error of that court is not without redress. He may apply to the superior tribunal to correct its • own error, and the power to do this,- it has been said, is inherent in every court of justice. Bright v. Hutton, 3 H. L. Cas. 341-388. This power the Supreme Court of the United States, in cases within its ordinary jurisdiction, has not infrequently exercised. But if, when the Supreme Court of the United States had once decided that a law of a state was unconstitutional, implicit obedience was -due from the courts of the state, there is no possible mode by which .an error, however clear and manifest, could be corrected; for the •courts of the state, in obedience to such a decision, afterward de•ciding in favor of the party claiming the validity, and the effect *495 •and operation of the provision of the constitution, the other party would have no right, under section 25 of the judiciary act, to apply to the Supreme Court of the United States to alter its decision and •correct its error.
There is this manifest distinction between a rule of law prescribed by legislative power, and what has been termed judge-made law-'The legislature, of its own motion, may modify and correct any rule which has been prescribed, but a rule emanating from a judicial authority can only be changed when an opportunity to do so is afforded by litigating parties. A case must arise presenting again the same question, and if all opportunity to present the question were cut off, the judge-made law would find its *onIy parallel in the famed laws of the Medes and Persians. This parallel would be the more perfect as to the decisions of the Supreme Court of the United States upon constitutional questions; for, as to them, the legislative power of Congress would be impotent to give relief. The principles which govern the decisions of courts of justice, do not permit any such conclusion.
A decision of an appellate court is conclusive upon the subordinate court, because it is the decision of the appellate court, and any modification of the appellate power which affects the right to have the question re-examined in the appellate court, to the same extent must affect the conclusiveness of the decision. If the appellate system be so anomalous as to give one party only a right of appeal, then, a court acting under such a system is bound to exercise some ■discretion in behalf of the party deprived of the benefit of an appeal. This discretion would be analogous to that often exercised by parties, or their legal advisers, when called on to abandon a claim, or prosecute an appeal, or a suit, in opposition to a decision of a court of last resort.
When the meaning of a legislature is expressed in clear and unambiguous terms, being conclusive evidence of the law, and not misunderstood, the duty of obedience follows; but surely the same effect can be claimed for no decision of a court expounding the meaning of a law; and it can not in that sense be regarded as a part of the law. It is only in the decision of cases, and through the control or influence such decisions have as precedents in other cases, that the courts can claim any power in relation to positive written law. They construe that law when necessary in a pai'fieular case; the power of deciding the ease makes that construction the law of *496 that case, but how far it shall be the law of another case, depends-upon the weight and effect of the decision, as a precedent.
The decision of an appellate court is evidence of law, and, in the inferior courts, in the nature of conclusive evidence. *But as to the appellate court itself, and all others who may be called upon to act in reference to a subject-matter which it affects, this attribute of conclusiveness can not be maintained. It may be disregarded, or, in the ordinary language for such purpose, overruled by the appellate court; and it follows that others, at the peril of not being' able to change the opinion of the appellate court, may treat the evidence as if it were not conclusive. From this limited effect of the decision upon the appellate court itself, it necessarily follows that the decision has no claim to regulate, as a matter of conscientious obligation, the action of others. They have a right to act, when they believe the decision to be erroneous, upon the supposition that it is so, and will bo so considered when submitted to a. re-examination in'the appellate court. Whether such action will be discreet or advisable, will depend upon the nature and character of the decision, the circumstances under which it was made, and the circumstances which will attend its re-examination. JBut it can. not bo said that such action is disrespectful to the appellate court, or that it shows an improper disposition to disobey the laws of the-land.
It is proper to notice another ground upon which the conclusiveness of the decision of the Sujureme Court of the United States upon such questions as the one in the case under consideration, has been placed by high authority. It has been said that it is “ a principle supposed to be universally recognized, that the judicial department, of every government, where such department exists, is the appropriate organ for construing the legislative acts of that government. Thus no court in the universe which professed to be governed by principle, would, it is presumed, undertake to say, that the courts of Great Britain, or of France, or of any other nation, had misunderstood their own statutes, and therefore erect itself into a tribunal which would correct such misunderstanding. We receive the construction given by the courts of the nation as the true *sonso of the law, and feel ourselves no more at liberty to depart from the construction, than to depart from the words of the statute. On this principle, the construction given by this court to the constitution and laws of the United States is received by all as the true con *497 struetion; and on the same principle the construction given by the courts of the several states, to the legislative acts of those states, is-received as true, unless they come in conflict with the constitution, laws, or treaties of the United States.” Elmendorf v. Taylor, 10 Wheat, 152-159, Marshall, C. J.
The ground hero assumed, though apparently different and more plausible, is really the same as the one before examined. No one-has more clearly shown than the very distinguished person who-made those remarks, when speaking on another occasion, and not. in a judicial capacity, that courts are constituted to decide cases,, and not abstract questions of law. 5 Wheaton, App. The judicial department of the government of the United States is no otherwise-the organ to construe its constitution and statutes, than by the decision of cases, and we are thus brought back to the inquiry, how far the decision in one case is binding as a precedent for the decision of another.
It may be very fairly questioned whether the decision of the court of last resort in Great Britain, as to the meaning of one of the statutes of that country, would be necessarily conclusive in a court of this-country, if a case should arise involving an inquiry into such meaning. The same consideration which has been discussed, might, limit and qualify the weight of the decision as evidence of the law, and place the court in this country in a different position from that of one of the inferior courts of Great Britain. The party asserting' a claim or making a defense, upon a law of Great Britain, must “ show the law in the usual manner, by the production of the edict itself, by recorded applications of it in a legal form, and by the testimony of eminent professors of the law.” The Snipe, Edwards’ Adm. 381-412. All this would be proper and competent *evidence to be weighed by the court. De Bode’s case, 8 Q. B. 208-250, It might very well happen that testimony of learned professors of the law might outweigh a judicial decision, when such testimony showed the great probability that, if the question were again presented, a different decision would be made. For example, the decision as to the meaning of a statute in the case of Hutton v. Uphill, 2 H. L. Cas. 674, though followed and applied according to the principle upon which it appeared to have been decided, was unsatisfactory to the profession and the inferior courts, and it was clearly their opinion that an erroneous decision had been made. Aceordingly, when the question was brought before the House of Lords in *498 another case, the former decision was substantially overruled, and the true principle admitted and applied. Bright v. Huttan, 3 H. L. Cas. 341.
■ It would be difficult to maintain that a court in this country would bo bound, like an inferior court' in England, by such an erroneous decision, or that it might not properly act upon the evidence showing it to be erroneous. Justice would require a court so to'act, for the simple i*eason that there would otherwise be no redress, there being no right of appeal.
It may also be observed, that there is a most important particular in which the analogy between the decision of a British or French court as to the meaning of a law of its country, and the decision of the Supreme Court of the United States as to the meaning of a clause of the constitution, is very imperfect, when applied to the action of a court of one of the states. The constitution of the United States is-not to us the law of a foreign country. Its meaning is not to be ascertained in the same way. It is the supreme law of the land. We, equally with the judges of the ’Supreme Court of the United States, are bound by our duty as cit-zens, and by our oath as magistrates, to support that constitution as our law, and as the law of paramount obligation. The differ - ence .between us is, that upon them ^duties of higher import are devolved, and duties which more frequently bring under their -consideration questions under the constitution and laws of the United States. This difference, undoubtedly, gives to the decision -of the Supreme Court of the United States, upon such questions, a ■claim to the greatest respect and highest consideratibn; but, unless they were binding and conclusive upon that court itself, which no ■one has ever claimed, it is entirety too strong an expression to say that they are of equal obligation with the words of the constitution or the statutes.
There is another argument to be drawn from the remarks in the ■case of Elmendorf v. Taylor, which it is proper to notice, and which, in some classes of cases, has great force to induce the courts of a state to yield to the construction placed upon the constitution hud laws of the United States by the courts of the United States. It may bo thus stated: The Supreme Court of the United States, in construing the constitution and laws of a state, is governed by the decisions of the highest court of the state. Therefore, the icourts of a state should be governed by the decisions of the Su *499 preme Court of the United States, construing the constitution and laws of the United States. If an ordinary act of Congress, not trenching upon the rights of a state, or even a provision of the constitution operating upon matters within the sphere of the general government, were construed, the above rule might claim a controlling effect. But there is a class of cases in which the Supreme Court of the United States is freed from the observance of the rule as to the constitution and laws of a state — that is, when they are supposed to conflict with the constitution or laws of the United States. As to this class of cases, then, there is no reciprocity in the rule, and this leads to an inquiry'into the foundation of the rule, so far as it regulates the action of the courts of the United States. It will be seen that the observance of any such rule on the part of the courts of the United States is not so much from ■*comity and respect to the courts of a state as in compliance with an act of Congress.
The provision of the act, its construction, and remarks strongly bearing on some of the questions which have been discussed, are found in a case decided by the Supreme Court of the United States. It had been argued in that case that the 34th section of the judiciary act, required the court to follow the decisions of the state •courts of New York. In answer to that argument it was said: “That section provides ‘-that the laws of the several states, except where the constitution, treaties, or statutes of the United States ■shall otherwise require or provide, shall be regarded as rules of decision in trials of common law in the courts of the United States in cases where they apply.’ In order to maintain the argument it is essential, therefore, to hold that .the word ‘laws’ in this section Includes within the scope of its meaning the decisions of the local tribunals-. In the ordinary use of language it will hardly be contended that the decisions of courts constitute laws. They are, at most, only evidences of what the laws are, and are not of themselves laws. They are often re-examined, reversed, and qualified by the courts themselves, whenever they are found to be either defective or ill-founded, or otherwise incorrect. The laws of a state .•are more usually understood to mean the rules and enactments promulgated by the legislative authority thereof, or long-established local customs having the force of laws. In all the various cases which have hitherto come before us for decision, this court have uniformly supposed that the true interpretation of the 34th section *500 limited its application to state laws strictly local, that is to say, to> the positive statutes of the state, and the construction thereof adopted by the local tribunals, and to rights and titles to things-having a permanent locality, such as the rights and titles of real estate, and other matters immovable and intra-territorial in their nature and character. It has never been supposed by us that the-section did apply, or was designed to apply, to questions *of a more general nature, not at all dependent upon local statutes or local usages of a fixed and permanent operation, as, for example, to-the construction of ordinary contracts or other written instruments,- and especially to questions of general commercial law, where the-state tribunals are called upon to perform the like functions as ourselves, that is, to ascertain upon general reasoning and local analogies, what is the true exposition of the contract or instrument, or what is the just rule furnished by the principles of commercial law to govern the case. And we have not now the slightest difficulty in holding that this section, upon its true intendment and. construction, is strictly limited to local statutes and local usages of' the character before stated, and does not extend to contracts and' other instruments of a commercial nature, the true interpretation, and effect whereof are to be sought, not in the decisions of the local tribunals, but in the general principles and doctrines of commercial-jurisprudence. Undoubtedly the decisions of the local tribunals-upon such subjects are entitled to and will receive the most deliberate attention and respect of this court; but they can not furnish, positive rules or conclusive authority by which our own judgments, are to be bound up and governed.” Swift v. Tyson, 16 Pet. 1-18, Story, J.
The rule which has been prescribed to the Supreme Court of the-United States by statute, has thus been limited by construction. Whether correctly or not, it is not for us to say. But when we are-called upon to adopt a like rule, from comity and respect, we must bo entitled to the privilege of so limiting its application as to make-it fair and equal in its operation. As to the class of cases of which the present is one, they are, so to speak, exempted from the operation of the rule — they .concern a boundary lino, a debatable ground,, and from their very nature and important consequences, decisions in them can not, to say the least, be regarded as establishing a rule to be yielded to as correct, when there is a clear conviction to the *501 «contrary, on the *part of those affected, until they have been repeatedly and fully sifted and examined.
If — as we have endeavored to show, and an effort has been made to do this the more fully, from the profound respect for the decisions of the .Supreme Court of the United States — the decision of that court in the case of Dodge v. Woolsey does not conclude our judgment, but leaves us to exercise a discretion in admitting its effect ,as a precedent, there are several important considerations which influence that discretion. We can not conceal from ourselves the fact that the state, under whose authority we are acting, has a vital 'interest in the question.involved in this case. It is true, the state 'is not in form a party, but that makes h more important, before ¡any precedent is admitted which seriously affects her interests, that its weight as evidence of the law should be carefully determined.
In form, the present action, in the disposition of which error is .alleged, is brought by a corporation of this state against an individual citizen. In substance and effect, it is an action against the ¡i?tate. If a mere officer of the state, in obedience to a law plain in its meaning, collects money and pays it into the treasury of the state, and, afterward, is compelled to account for that money to the party from whom it was taken, upon the ground that the laW, though clothed with the usual forms and plain in its terms, was in .truth no law, it is a proposition too plain' to be argued, that the ¡state can not in justice or honor retain that money. The obligation to return it, though it might not be enforceable by legal pro•cess, would be irresistibly felt by those vested with the authority to .act.
A state may, perhaps, safely trust its own judicial authorities to .arrest the performance of an official act, or declare official proteótion unavailing, but the exercise of such a power, in any form, by ¡an authority independent of the state government, is certainly well •calculated to induce serious apprehension. The government of the United ^States is a government of power, acting upon individuals in their individual capacities. If the judicial power of that government can in any form be exercised upon the mere agents of a state, acting within the very letter of legislative authority, by taking from them the protection it would afford, on the ¡ground of its invalidity, and leaving them responsible in their individual capacities, the judicial authority of the state, when called •on to admit that a case proper for such exercise of power has *502 "been established by precedent, is bound to scrutinize closely its correctness.
Another consideration which influences our discretion, is the character of the decision we are called on to admit as a binding precedent, and the circumstances attending the action of the court' in making that decision. On that and on a former occasion, cmi - nent and learned judges of that court expressed thejr dissent in. terms so strong, and sustained by arguments so cogent, that wo feel justified in admitting its effect upon the weight of the precedent.. It is impossible to regard any doctrine against which such a protest was entered, as settled and established.
To the arguments advanced by those judges, and to those heretofore advanced in this court, it is not in our power to add anything new. But we take this occasion to make a few observations-upon a distinction pointed out in those arguments.
In the opinions of the judges who decided the leading case upon this subject (Dartmouth .College v. Woodward, 4 Wheat. 5l8), and. which contains the principles upon which all the others have been decided, the steps are clearly shown by which the conclusion was-reached that a charter is a contract, within the meaning of the constitution of the United States. A definition is given of a contract, by which it is shown that in its ingredients are “ parties, consent,, and an obligation to be created or dissolved ” (4 Wheat. 656, Washington, J.) ; that a contract may be executed or executory : “ A contract executed *is one in which the object of contract is performed ; and this, says Blackstone, differs nothing from a grant. A contract executed, as well as one that is executory, contains obligations binding upon the parties. A grant, in its nature, amounts to-an extinguishment of the right of the grantor, and implies a contract not to reassert that right. A party is always estopped by his-own grant.” 4 Wheaton, 682, Story, J. A grant being thus shown to be a contract, the next step is to show that a charter is a grant or contract executed. Eor this purpose reference is had to the English authorities. “A corporation is defined by Mr. Justice-Blackstone to be a franchise. It is, says he, a franchise for a number of persons to be incorporated and exist as a body politic, with, power to maintain perpetual succession, and to do corporate acts, and each individual of such corporation is also said to have a franchise or freedom. This franchise, like other franchises, is an incorporeal hereditament issuing out of something real or personal, or- *503 concerning or annexed to and exercisable within a thing corporate. To this grant or franchise the parties are the king, and the persons for whose benefit it is enacted, or trustees for them. The assent of both is necessary. The subjects of the grant are not only privileges and immunities, but property, or, which is the same thing, a capacity to acquire and to hold property in perpetuity. Certains obligations are created, binding on both the grantor and the grantees.. On the part of the former, it amounts to an extinguishment of the king’s prerogative to bestow the same identical franchise on another corporate body, because it would prejudice his prior grant. It implies therefore a contract not to reassert the right to grant the franchise to another or to impair it,” 4 Wheaton,. 657, Washington, J. “Mr. Justice Buller, in the ease of the King v. Passmore, says that the grant of incorporation is a compact between the crown and a number of persons, the latter of whom undertake, in consideration of the privilege bestowed, to exert themselves for the good ^government of the place.” . . “ These principles and authorities prove ineontrovertibly that a charter of incorporation is a contract ” (4 Wheaton, Washington, J.) ; which was the proposition to be demonstrated, and the syllogism became perfect.
But it is a rule of logic, as it is of good sense, that no conclusion-should express, or should be construed to express, what is not contained in the premises. The fallacy in applying that conclusion to such a case as the present, consists in the simple fact that no king of England could grant an exemption from taxation. The power of taxation was a parliamentary power, not touched by the king’s prerogative. The definition of a contract should be extended ; there must be parties, and they must be competent to contract ; “ there must be an obligation to be created or dissolved,” but. it must be one which the law permits to be created. The power of taxation can not be regarded as the proper subject-matter of a. contract.
The legislature of a state, as suggested in the argument in the Dartmouth College case, has succeeded, to a certain extent, to the prerogative of the king and to the legislative power of Parliament. But in determining how far a charter, which assumes the form of legislative enactment, is a contract, and how far an exercise of legislative power, the distinction between the prerogative power and the legislative power should not be confounded. It is essential *504 to the rights of the states, in view of any restriction upon their legislative powers, that the distinction should be sharply drawn. If we are to learn from English authorities that a charter is a contract which a king of England could not revoke, it is unfair not to give the same authorities full effect in ascertaining and deciding what was the proper subject-matter of such a contract.
This distinction, in reference to corporations, between the prerogative of the king and the powers of Parliament, has, in modern o times, been noticed in England. “Although it * was always in the power of the crown to confer on any set of individuals the privileges of a corporation, such as a common seal, and perpetual succession, to sue and be sued, and receive and convey by its corporate name; yet there were many powers which the crown could not, by its prerogative, but which Parliament alone could confer.” . . . “ Formerly, indeed, when the want of these powers was not much felt, the immediate creative act was usually performed by the sovereign alone, in virtue of the royal prerogative. But in modern times, corporations have been usually created either directly or immediately by act of Parliament — of which special railway companies are a well-known example — or created by the crown, or formed by a prescribed number of private individuals, under the authority of acts of Parliament passed for the purpose.” 1 Kerr’s Blackstone, 503.
To railway acts of the description above referred to, in which the interposition of Parliament was indispensable to enable them to take private property, upon making compensation, the term “parliamentary contracts ” was applied, as if Parliament had made a contract in behalf of the public, or those interested in the construction of the road. 1 My. & K. 154-162. But such an impression was held in a recent case to be incorrect, it being said: “ Though erroneously so spoken of, railway acts are not, in our opinion, contracts, and ought not to be construed as such.” York, etc. R. R. Co. v. The Queen, 1 Ellis & Blackburn, 856-864.
Great caution should certainly be used in applying to the corporations of the present day an analogy drawn from principles applied to coi’porations in former times, in view either of their powers or their immunity from legislative control. A class of corporations which consists of individuals associated together for the purposes of trade or business had not, at the time of the adoption of the constitution of the United States, received much attention in leg- *505 relation or in judicial decisions. It is in more modern *times that such a system of association has received in England and in this country a gigantic development. The principles, therefore, which should affect the action of governments toward such associations have become of transcendent importance.
These remarks have been carried further than was intended, and but one observation will be added. It is difficult to draw a distinction as to the principle on which they rest, between the right •of eminent domain and the power of taxation. The difference is in their operation — the latter is general, and the former special. By the latter, a portion of the property of individuals is taken, .and the compensation is. the benefit and protection of government; by the former, the property of one is specially appropriated, and it is therefore proper that the rest of the community should •contribute to his loss. There is no principle which forbids the restriction of the one, that does not equally apply to the other. Both constitute an important portion of the legislative trust, that can not be parted with, and which it is the duty of each legislature to transmit unimpaired to their successors. With this duty, it can not be supposed that the constitution of the United States was ever intended by its framers, to interfere.
These high legislative powers are, in their very nature, illimitable by any precise rule. The wants of a government in future time can not be measured by the standard of to-day. It can not become a question of degree or of class. IIow far legislatures ■should act upon such matters must rest upon legislative discretion, and the form their acts assume can not be material. If in so acting, wrong be done in any case, the party affected must be left to the sense of legislative justice. Such cases are beyond the pi’oper sphere of judicial authority.
It is the opinion of a majority of this court, that we should adhere to the opinion expressed in the decision of the case of the Sandusky Bank v. Wilbor, 7 Ohio St. 481. And of this decision it may be mentioned, that it ^stands unreversed, though decided in the way which made it subject to review. Indeed, we are not aware that it has been the subject of appeal. What may be our duty, or the duty of our successors upon this bench, in any future phase of this most important question, we need not undertake to suggest or determine. Our present duty, we think, requires us to say, that there was error in the charge of the court *506 to the jury, that the act of the legislature imposing a tax upon the property of the defendant in error, was unconstitutional, and afforded no protection to the plaintiff in error.
The judgment of the district court will therefore be reversed.
Brtnkerhoee, C. J., and Suture,. J.,. concurred.
Scott and Peck, JJ.. dissented as to the third andjburth propositions of the syllabus.